[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11394

_____

LAQUAN JOHNSON,

Plaintiff-Appellant,

*versus*

ELAINE TERRY,
OFFICER BURGESS,
DR. MARTIN,
DR. WINSTON,
MS. GARCIA, et al.,

Defendants-Appellees,

DARLENE DREW, et al.,

2                          Opinion of the Court                    23-11394

                                                                    Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-01899-AT

_____

Before BRANCH, GRANT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

LaQuan Johnson is a federal prisoner who filed a complaint asserting claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). He sought money damages from federal prison officials, doctors, a nurse, and a kitchen supervisor alleging that they violated his constitutional rights by using excessive force, by failing to protect him from other inmates, and by being deliberately indifferent to his serious medical needs.

The Supreme Court has decided that "in all but the most unusual circumstances," we should not use *Bivens* to recognize new constitutional-claim causes of action for damages against federal officials. *See Egbert v. Boule*, 596 U.S. 482, 486, 491 (2022). The Court has instructed us that the reason we aren't free to use *Bivens* to "fashion[] new causes of action," *id*. at 490, is that "prescribing a cause of action is a job for Congress, not the courts," *id*. at 486. The claims Johnson has asserted would require new *Bivens* causes of

action, which we are forbidden to create except in the "most unusual circumstances," if then.  *Id.* at 486.

## I. Facts and Procedural History

LaQuan Johnson is a federal prisoner who was housed at the United States Penitentiary in Atlanta, Georgia, which we'll call USP-Atlanta, from September 2015 to April 2019.  He was a pretrial detainee until he was tried and convicted on April 14, 2017.[1]

According to USP-Atlanta's policy while Johnson was housed there, pretrial detainees and convicted inmates were usually housed in separate units.  In mid-June 2016, while Johnson was still a pretrial detainee, an inmate he knew as "Phillip" moved into his cell in the pretrial unit.  Phillip was not a pretrial detainee; instead, he was being confined because he had been convicted.  Johnson told an officer that as a pretrial detainee, he should not be housed in the same unit as Phillip, let alone in the same cell.  Phillip was moved out of Johnson's cell, but soon after, Elaine Terry, a correctional counselor at USP-Atlanta and one of the defendants, moved Phillip back into Johnson's cell in the pretrial unit and

---

[1] Johnson appeals the district court's grant of the defendants' motion for summary judgment.  Given that, we are required to view the facts as drawn from the pleadings, affidavits, and depositions, in the light most favorable to him.  *E.g., Hardin v. Hayes,* 957 F.2d 845, 848 (11th Cir.1992); *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1503 (11th Cir.1990).  What we state as "facts" in this opinion may not be the actual facts.  They are, however, the facts for summary judgment purposes.  *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 992 (11th Cir. 1995).

moved Johnson to a different cell in the same unit. Johnson complained to Terry that Phillip was not supposed to be housed in a pretrial unit, but she ignored his complaint.

A week later, Phillip got into an argument with Lewis Mobley, a different pretrial detainee housed in the pretrial unit. Johnson intervened to try and keep the two from fighting. That resulted in Phillip hitting Johnson and pushing him into a toilet, which fractured bones in Johnson's right hand (the first attack).

Later that day Johnson went to "health services," which is the prison's medical clinic, to get his hand evaluated. He was treated by a nurse who x-rayed, splinted, and wrapped his hand. The x-rays indicated that Johnson had fractured a bone in his hand. Johnson claims that Dr. Darren Martin, who viewed the x-rays, instructed someone named Ms. Robinson to tell Johnson his hand wasn't broken, and then the medical providers gave him ibuprofen. All of that happened in mid-to-late June 2016.

Johnson again complained about his hand injury in July 2016 and in October 2017. In July of 2016 he was seen by a nurse practitioner, who offered to x-ray and bandage Johnson's hand, but he refused. He was also seen by a nurse practitioner in October 2017 who x-rayed his hand and found that the fracture had healed. Dr. James Winston reviewed and cosigned both nurse practitioners' notes from their interaction with Johnson.

In or around October 2016, Johnson informed Warden Darlene Drew that he was being housed with convicted prisoners

when he was a pretrial detainee. Drew did nothing to correct the problem.

In March 2018 a convicted inmate named Walter Bush attacked Johnson (the second attack). (At this point, Johnson had been convicted and was no longer a pretrial detainee.) Bush injured Johnson's right hand during the attack. Johnson went to health services a couple of days later and was seen by a nurse practitioner. The nurse practitioner ordered an x-ray of Johnson's hand, found that there were no new fractures, and offered Johnson pain medication. He declined it, stating that he already had some. The nurse practitioner told Johnson that a doctor would be contacted to come check on him, but none of the doctors on staff ever spoke to Johnson about his injury. Dr. Winston reviewed the nurse practitioner's notes from the encounter and signed off on the assessment.

In April 2018 Johnson was once again attacked by another inmate (the third attack). He says that he was watching TV when a convicted inmate named Cedric Brown punched him in the face and fractured his jaw. Johnson was seen by a dentist, who then referred him to an oral surgeon. The oral surgeon operated on Johnson's jaw, then wired his mouth closed to help with the healing process. The surgeon directed that Johnson consume a liquid diet for six weeks while his mouth was wired shut.

Johnson contends that Carolina Garcia, a kitchen supervisor, was in charge of giving him his liquid diet, and she provided it as directed for two weeks; but then she stopped. After not receiving

his liquid diet for two days, Johnson cut the wires out of his mouth with fingernail clippers so that he could eat.  He then began chewing regular food with his fractured jaw.  The food got stuck in the wound in his mouth and began to rot.  Once the food rotted, one of Johnson's teeth also rotted and needed to be removed.

A few months later, in August 2018, a group of prisoners were playing basketball in an outdoor recreation area when the ball got stuck in the rim.  Because Johnson is tall, they asked him if he could get the ball down.  He jumped up and landed on a screw when he came down; the screw punctured his foot and caused severe bleeding.  Johnson went inside to find help and saw Nurse Terrisha Harris passing out medicine.  He asked her for help, but she refused to treat his foot.  He then explained his predicament to an unidentified officer, who brought him two pairs of socks to help stop the bleeding.

Two days later, Johnson reported to health services and was seen by Dr. Winston, the same doctor who had reviewed Johnson's medical records after Bush had injured Johnson's hand.  Dr. Winston gave Johnson a tetanus shot and took some x-rays.  The radiologist's report determined that the x-ray showed no acute fracture or "joint space malalignment," and that no "foreign body" remained in Johnson's foot.  Dr. Winston told Johnson that he would follow up with him to see how his foot was healing, but Johnson never saw him again.  Johnson tried reaching out to Dr. Winston about a follow-up, but he was not able to get in touch with him.

When he was unable to get in touch with Dr. Winston, Johnson mentioned his injury to Dr. Michael Nwude while the doctor was walking through Johnson's unit. Dr. Nwude told Johnson that he would "call [him] up to the health service" so that he could be provided with arch support for his shoes to help with his foot injury. But Dr. Nwude did not do that, and the next time Johnson saw Dr. Nwude walking through the unit, the doctor refused to talk to him. At the time he filed this lawsuit, Johnson still walked with a limp because of his foot injury.

Johnson attempted to file complaints with the Bureau of Prisons (BOP) about the attacks he had experienced and the lack of adequate medical care he had received while at USP-Atlanta. To resolve inmate complaints that arise at USP-Atlanta and other federal prisons, the BOP uses a four-level administrative remedy program. The purpose of the program "is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement." 28 C.F.R. § 542.10(a); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[The administrative remedy program] provides [a] means through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring.").

The first step is an "informal resolution" process within individual institutions. *See* 28 C.F.R. § 542.13(a). To begin this process, a prisoner may present his complaint to prison staff on a grievance form known as a BP-8 form. *See id.* In addition to (or instead of) informal resolution, the inmate can submit a formal grievance

on a BP-9 form to staff at the institution where he is located.  *See id.*
§ 542.14(a), (c)(4); *see also id.* § 542.13(b) (providing that the inmate
is "not required to attempt informal resolution").  If the inmate
feels that submission of a formal grievance at his institution will
compromise his "safety or well-being," he may bypass that process
and submit his formal request to the regional director.  *See id.* §
542.14(d)(1).  If he is unsatisfied with the warden's response to his
complaint, he may appeal to the regional director (on a BP-10
form), and then to the office of general counsel (on a BP-11
form).  *See id.* § 542.15(a).  Johnson testified in his deposition that
Terry (the correctional counselor) either would refuse to give him
any of the various informal or formal grievance forms when he
asked, or would give Johnson a form but refuse to file it after John-
son had filled it out.  He swore in an affidavit that when he was
eventually able to obtain and file grievance forms, he did not re-
ceive any response.  Johnson also testified that "if you get no re-
sponse it[']s like a denial," so he then appealed those "denials."  But
he says that when he filed an appeal, he would be notified that he
had failed to comply with an earlier step in the four-level program.

Johnson claims that the officers at USP-Atlanta purposefully
sabotaged his grievances, by either: (1) failing to file his initial griev-
ances; (2) failing to return the responses to his grievances so that if
Johnson appealed, he would not know why the grievance was ini-
tially denied; or (3) waiting until his appeal deadline had passed be-
fore sending him rejection notices, which would result in his ap-
peals being untimely.

Johnson filed suit in federal district court, bringing failure to protect, deliberate indifference, and excessive force claims against a number of officers, medical staff, and an employee at USP-Atlanta.  The defendants filed a motion to dismiss his complaint for failure to exhaust his administrative remedies because he did not comply with the BOP's administrative remedy program before filing his complaint.  The district court denied the motion without prejudice and provided the parties with a limited discovery period to determine whether Johnson had exhausted his administrative remedies.  After discovery closed, the defendants renewed their motion to dismiss.  The magistrate judge assigned to the case found that Johnson was denied access to the administrative remedy program at USP-Atlanta and recommended that the court deny the motion to dismiss.  Over the defendants' objections, the court adopted that report and recommendation and denied the motion.

After additional discovery the defendants moved for summary judgment, arguing in part that Johnson's *Bivens* claims are not cognizable.  The magistrate judge recommended that the court grant the defendants' motions for summary judgment because his *Bivens* claims presented a new context and special factors counseled against extending *Bivens* to that new context.  The district court agreed and granted the defendants' motions for summary judgment, concluding that Johnson's claims did not entitle him to a *Bivens* remedy.  Johnson appeals that judgment.

## II.  *Bivens* Law Through the Years and Today

Claims for money damages against federal officials and employees who have committed constitutional violations are known as *Bivens* claims, after the Supreme Court's decision in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

When it enacted 42 U.S.C. § 1983, Congress allowed an injured person to sue for money damages claiming that a *state* official had violated his constitutional rights. Congress has never enacted a corresponding statute providing a damages remedy to plaintiffs whose constitutional rights have been violated by a *federal* official. *See Ziglar v. Abbasi*, 582 U.S. 120, 130 (2017). Nevertheless, in *Bivens*, the Supreme Court created for the first time an implied private right of action for damages against federal agents, at least for a violation of the Fourth Amendment. *See* 403 U.S. at 397. The Court concluded that it had the authority to do so because "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Id*. at 392 (quotation marks omitted).

In the decade after *Bivens*, the Court created two more causes of action for violations of constitutional rights by federal officials. One was against a Congressman under the Fifth Amendment for sex discrimination after he fired his secretary because she was a woman; another was against federal prison officials under the Eighth Amendment for failing to treat an inmate's asthma, resulting in his death. *See Davis v. Passman*, 442 U.S. 228, 230–31 (1979);

*Carlson v. Green*, 446 U.S. 14, 16 & n.1, 18 (1980).  As in *Bivens*, the Supreme Court stated that the purpose behind those decisions was "to deter individual federal officers from committing constitutional violations."  *Malesko*, 534 U.S. at 70.  But there the Supreme Court's creative decision-making that had birthed the *Bivens* doctrine stopped.

In the 44 years since *Carlson*, the Supreme Court has over and over again "refused to extend *Bivens* to any new context or new category of defendants."  *Ziglar*, 582 U.S. at 135 (quotation marks omitted); *see Bush v. Lucas*, 462 U.S. 367, 368 (1983) (holding there is no *Bivens* action for "federal employees whose First Amendment rights are violated by their superiors"); *Chappell v. Wallace*, 462 U.S. 296, 305 (1983) (declining to create *Bivens* action for enlisted military personnel against their superior officers); *United States v. Stanley*, 483 U.S. 669, 684 (1987) ("We hold that no *Bivens* remedy is available for injuries that arise out of or are in the course of activity incident to [military] service.") (quotation marks omitted); *Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988) (declining to recognize *Bivens* action for due process violations resulting from denial of Social Security disability benefits); *FDIC v. Meyer*, 510 U.S. 471, 473 (1994) (holding there can be no *Bivens* action against a federal agency); *Malesko*, 534 U.S. at 63 (declining to create a *Bivens* remedy against "a private corporation operating a halfway house under contract with the Bureau of Prisons"); *Wilkie v. Robbins*, 551 U.S. 537, 541 (2007) (declining to recognize *Bivens* action against "[o]fficials of the Bureau of Land Management . . . accused of harassment and intimidation aimed at extracting an easement across

private property"); *Hui v. Castaneda*, 559 U.S. 799, 801–02 (2010) (disallowing *Bivens* remedy against U.S. Public Health Service employees for "constitutional violations arising out of their official duties"); *Minneci v. Pollard*, 565 U.S. 118, 131 (2012) (finding no *Bivens* remedy when prisoner sued "privately employed personnel working at a privately operated federal prison" under the Eighth Amendment); *Ziglar*, 582 U.S. at 125, 146 (declining to extend *Bivens* to conditions-of-confinement claim against group of executive officials); *Hernandez v. Mesa*, 589 U.S. 93, 96–97 (2020) (declining to recognize *Bivens* remedy for cross-border shooting by border patrol agent); *Egbert*, 596 U.S. at 486 (declining to allow excessive force and First Amendment retaliation *Bivens* claims against a U.S. Border Patrol agent to proceed).

The Supreme Court has explained that its nearly complete about-face in the *Bivens* area after *Davis* and *Carlson* results from its having "come to appreciate more fully the tension between judicially created causes of action and the Constitution's separation of legislative and judicial power." *Egbert*, 596 U.S. at 491 (quotation marks omitted). The Court understands that "it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." *Ziglar*, 582 U.S. at 133. And because the power to create causes of action is legislative, "[i]n most instances . . . the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability." *Id*. at 135–36 (quotation marks omitted); *see*

*also Egbert*, 596 U.S. at 492 (explaining that unless a court exhibits the "utmost deference to Congress' preeminent authority in" creating a cause of action, it "arrogate[s] legislative power") (alteration accepted) (quotation marks omitted).

Creating causes of action involves complex policy considerations, including "economic and governmental concerns, administrative costs, and the impact on governmental operations systemwide." *Egbert*, 596 U.S at 491 (quotation marks omitted). The ability of courts to weigh those considerations is "at best, uncertain." *Id.* Thus "recognizing a cause of action under *Bivens*" outside of the three contexts already allowed by the Supreme Court "is a disfavored judicial activity" and should be avoided "in all but the most unusual circumstances." *Id.* at 486, 491 (quotation marks omitted). Judging from the Court's decisions in the last four-and-a-half decades, those "most unusual circumstances" are as rare as the ivory-billed woodpecker.[2]

---

[2] So rare is the ivory-billed woodpecker that many experts have come to believe it is extinct. As one expert wrote in 2017: "The last bird, a female, was seen in 1944 . . . . Sadly, most ornithologists now think the bird is gone forever." Andy Kratter, *Ivory-billed Woodpecker*, Florida Museum (2017), https://www.floridamuseum.ufl.edu/100-years/object/ivory-billed-woodpecker. In 2021 the Fish and Wildlife Service, which is in charge of such determinations, proposed declaring that the big woodpecker is extinct. *See* Endangered and Threatened Wildlife and Plants; Removal of 23 Extinct Species from the Lists of Endangered and Threatened Wildlife and Plants, 86 Fed. Reg. 54298-01 (Sept. 30, 2021) (to be codified at 50 C.F.R. 17). But in 2022 the Service pulled back from that proposal and extended the period for public comment, recognizing "substantial disagreement among experts regarding the status of the species." Ian Fischer, *Service Announces 6-Month Extension on Final*

Remarkably, the Supreme Court has even "gone so far as to observe that if 'the Court's three *Bivens* cases had been decided today,' it is doubtful that we would have reached the same result." *Hernandez*, 589 U.S. at 101 (cleaned up) (quoting *Ziglar*, 582 U.S. at 134).  And even more pointedly, just two years ago the Court told us that "we have indicated that if we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution."  *Egbert*, 596 U.S. at 502.  In other words, today the Court would decide the *Bivens* case, as well as its two progeny, *Davis* and *Carlson*, differently.  *See also Malesko*, 534 U.S. at 75 (concurring opinion of Scalia, J., joined by Thomas, J.) ("*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action — decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition.").

---

*Decision for the Ivory-billed Woodpecker*, U.S. Fish & Wildlife Service (July 6, 2022), https://www.fws.gov/press-release/2022-07/service-announces-6-month-extension-final-decision-ivory-billed-woodpecker.  More recently, a research team, after searching over a period of several years in the dense bottomland forests of Louisiana, reported evidence that three of the ivory-bills (as ornithologists call them) still exist.  Steven C. Latta et al., *Multiple lines of evidence suggest the persistence of the Ivory-billed Woodpecker (Campephilus principalis) in Louisiana*, ECOLOGY AND EVOLUTION (May 18, 2023), https://doi.org/10.1002/ece3.10017.  If that's true, the number of the birds that exist will exactly match the number of Supreme Court decisions that have confirmed and applied *Bivens* in the last forty-three years: three live ivory-billed woodpeckers and three live *Bivens* decisions.  A coincidence of rarity.

The Supreme Court has been clear, however, that it has not yet overruled the *Bivens* decision insofar as the decision itself goes. *See Ziglar*, 582 U.S. at 134 ("[T]his opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context . . . ."); *see also Egbert*, 596 U.S. at 502 ("[T]o decide the case before us, we need not reconsider *Bivens* itself."). But it has also been clear that when courts are thinking about recognizing a new *Bivens* claim, the "watchword" is "caution" — so much caution that it has not found a new *Bivens* claim worth recognizing in 44 years. *Egbert*, 596 U.S. at 491 (quotation marks omitted); *Malesko*, 534 U.S. at 68 ("Since *Carlson* we have consistently refused to extend *Bivens* liability to any new context or new category of defendants."); *see also id.* at 74 ("The caution toward extending *Bivens* remedies into any new context, a caution consistently and repeatedly recognized for three decades [now more than four decades], forecloses such an extension here.") (bracketed words added).

As Justice Gorsuch aptly put it when calling on the Court to forthrightly overrule *Bivens*, what the Court has done is "leave[] a door ajar and hold[] out the possibility that someone, someday, might walk through it even as it [has] devise[d] a rule that ensures no one ever will." *Egbert*, 596 U.S. at 504 (Gorsuch, J., concurring) (quotation marks and ellipsis omitted); *see also Hernandez*, 589 U.S. at 118 (Thomas, J., concurring) ("The analysis underlying *Bivens* cannot be defended. We have cabined the doctrine's scope, undermined its foundation, and limited its precedential value. It is time

to correct this Court's error and abandon the doctrine alto-
gether.").

Taking to heart what the Supreme Court has done to limit
*Bivens'* precedential value and drastically restrict its reach, we re-
cently refused to extend *Bivens* to a Fourth Amendment excessive
force claim against United States Marshals and county police offic-
ers conducting a joint state and federal task force to apprehend fu-
gitives. *See Robinson v. Sauls*, 102 F.4th 1337, 1339, 1347 (11th Cir.
2024).

We are not the only court to have taken to heart what the
Supreme Court has said on this subject. All of our sister circuits
have also stressed the need for caution, hesitancy, and reluctance
when it comes to extending the *Bivens* decision. *See Gonzalez v. Ve-
lez*, 864 F.3d 45, 52 (1st Cir. 2017) ("While the boundaries of *Bivens*-
type liability are hazy, the Supreme Court . . . [has] made plain its
reluctance to extend the *Bivens* doctrine to new settings."); *Doe v.
Hagenbeck*, 870 F.3d 36, 43 (2d Cir. 2017) (acknowledging that "[t]he
Court has . . . made clear that it is reluctant to extend *Bivens* liability
to any new context or new category of defendants" and that "ex-
panding the *Bivens* remedy is now a disfavored judicial activity")
(quotation marks omitted); *Xi v. Haugen*, 68 F.4th 824, 833 (3d Cir.
2023) ("Most recently, in *Egbert* . . . , the Court went so far as to
suggest that any extension to a new context may be *ultra vires*.");
*Dyer v. Smith*, 56 F.4th 271, 277 (4th Cir. 2022) ("And this year [in
*Egbert*], the Supreme Court all but closed the door on *Bivens* reme-
dies."); *Cantú v. Moody*, 933 F.3d 414, 421–22 (5th Cir. 2019)

(explaining that the Court has "admonished [courts] to exercise caution in the disfavored judiciary activity of extending *Bivens* to any new set of facts") (quotation marks omitted); *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 523 (6th Cir. 2020) ("[The Court] has renounced the method of *Bivens*, *Davis*, and *Carlson*. When asked 'who should decide' whether a cause of action exists for violations of the Constitution, 'the answer most often will be Congress.'") (alteration accepted) (quoting *Ziglar*, 582 U.S. at 135); *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 891 (7th Cir. 2019) (stating that the Supreme Court has "limited the application" of *Bivens* and "made very clear that the expansion of the *Bivens* remedy to other constitutional provisions is a disfavored judicial activity") (quotation marks omitted); *Ahmed v. Weyker*, 984 F.3d 564, 571 (8th Cir. 2020) (explaining that its conclusion not to extend *Bivens* "should [not] be surprising" because "the Supreme Court has not recognized a new *Bivens* action for almost 40 years") (quotation marks omitted); *Chambers v. Herrera*, 78 F.4th 1100, 1105 (9th Cir. 2023) ("Essentially . . . future extensions of *Bivens* are dead on arrival.") (quotation marks omitted); *Silva v. United States*, 45 F.4th 1134, 1136 (10th Cir. 2022) ("The Supreme Court's message [in *Egbert*] could not be clearer — lower courts expand *Bivens* claims at their own peril. We heed the Supreme Court's warning and decline Plaintiff's invitation to curry the Supreme Court's disfavor by expanding *Bivens* to cover [this] claim."); *Loumiet v. United States*, 948 F.3d 376, 381 (D.C. Cir. 2020) (recognizing that "expanding the *Bivens* remedy is now a disfavored judicial activity" that requires "caution

before extending *Bivens* remedies into any new context") (quotation marks omitted).

Theoretically, we may someday see more Supreme Court decisions confirming and extending *Bivens*. Barring that unlikely event, for the time being the decision will remain on the judiciary's equivalent of an endangered species list, just like its natural history analogue, the ivory-billed woodpecker. Both the decision and the bird are staring extinction in the face.

Meanwhile, rarity doesn't foreclose false sightings. *See Fields v. Fed. Bureau of Prisons*, No. 23-6246, 2024 WL 3529034 (4th Cir. July 25, 2024). In the recent *Fields* case, a divided Fourth Circuit panel extended *Bivens* to a new context, allowing a federal prisoner's claims of excessive force in violation of the Eighth Amendment to proceed against individual prison officers. *See id.* at *1. A vigorous and cogent dissent rejected the "wiggle room" the *Fields* majority "purport[ed] to detect" in the Supreme Court's repeated warnings that courts should not extend *Bivens*. *Id.* at *9 (Richardson, J., dissenting).

The decision in *Fields*, a far-afield outlier, may lead to en banc reconsideration or to the Supreme Court finally rendering *Bivens* cases extinct. *See id.* at *14 (Richardson, J., dissenting) (predicting it may encourage the Court to finally "shut the *Bivens* door completely"). After all, the Supreme Court has stated as clearly as the English language permits: "[I]f we were called on to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution." *Egbert*, 596 U.S. at 502; *see also id.* at 502–04

(Gorsuch, J., concurring in the judgment) (urging the Court to overrule *Bivens* and "forthrightly return the power to create new causes of action to the people's representatives in Congress"). That "called on to decide *Bivens*" call may be coming if the panel decision in *Fields* manages to duck en banc correction. *Id.* at 502.

Until then, determining whether a new *Bivens* claim can be recognized involves a two-step analysis. *Egbert*, 596 U.S. at 492. To begin the analysis, courts first "ask 'whether the case presents a new *Bivens* context — *i.e.*, is it meaningfully different from the three cases in which the Court has implied a damages action.'" *Robinson*, 102 F.4th at 1342 (quoting *Egbert*, 592 U.S. at 492). The question is not a superficial one; for a case to arise in a previously recognized *Bivens* context, it is not enough that the case involves the same constitutional right and "mechanism of injury." *Ziglar*, 582 U.S. at 138–39. "If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Id.* at 139. And there are a lot of meaningful ways for cases to differ, as the examples the Court has supplied show:

> A case might differ in . . . meaningful way[s] because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of

potential special factors that previous *Bivens* cases did
not consider.

*Id.* at 139–40.

"[I]f a claim arises in a new context," the second step in the
analysis will make "a *Bivens* remedy . . . unavailable if there are spe-
cial factors indicating that the Judiciary is at least arguably less
equipped than Congress to weigh the costs and benefits of allowing
a damages action to proceed." *Egbert*, 596 U.S. at 492 (quotation
marks omitted). Central to this special-factors analysis "are sepa-
ration-of-powers principles." *Hernandez*, 589 U.S. at 102 (quotation
marks omitted). The inquiry focuses on "the risk of interfering
with the authority of the other branches, and . . . ask[s] whether
there are sound reasons to think Congress might doubt the efficacy
or necessity of a damages remedy." *Id.* (quotation marks omitted).

That analysis should not be applied at "a narrow level of gen-
erality," and it "does not invite federal courts to independently as-
sess the costs and benefits of implying a cause of action." *Egbert*,
596 U.S. at 496 (cleaned up). Instead, while conducting the special
factors analysis, "a court must ask more broadly if there is any rea-
son to think that judicial intrusion into a given field might be harm-
ful or inappropriate." *Id.* (cleaned up). "If there are [any special
factors] — that is, if we have reason to pause before applying *Bivens*
in a new context or to a new class of defendants — we reject the
request." *Hernandez*, 589 U.S. at 102; *see also Egbert*, 596 U.S. at 496
(explaining that even a "potential" for improper "judicial intrusion"
into the legislative realm is enough to refuse a plaintiff a *Bivens*

remedy) (cleaned up); *Robinson*, 102 F.4th at 1342–43 ("If there is even a single reason to pause before applying *Bivens* to a new context, a court may not recognize a *Bivens* remedy.") (quotation marks omitted).

### III. *Bivens* Should Not Be Extended Here

Johnson asks us to extend *Bivens* to allow him to bring three types of *Bivens* claims: his excessive force claim, his failure to protect claim, and his deliberate indifference to serious medical needs claims.

But the first of those claims is not properly before us. Johnson did not mention his excessive force claim in any of his briefing or otherwise make any arguments about it on appeal. So that claim is abandoned. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (concluding that a claim not adequately briefed was abandoned, explaining: "A party fails to adequately brief a claim when he does not plainly and prominently raise it, for instance by devoting a discrete section of his argument to those claims") (quotation marks omitted).[3] That leaves his failure to

---

[3] At oral argument, Johnson contended that he had raised his excessive force claim in his briefs to this Court by arguing that special factors did not preclude extending *Bivens* to all of his claims, including his excessive force one. But in his briefs Johnson never discussed the excessive force claim specifically and only referred to his "claims." Other than that general reference, the excessive force claim is mentioned just once in his brief, and that was only to note that Johnson had included the claim in his complaint. Even after the defendants asserted in their response brief that Johnson had abandoned the excessive force claim by not raising it, he did not address that claim or the abandonment issue involving it in his reply brief. So his attempt to revive the claim at oral

protect claim and his deliberate indifference to serious medical needs claims.[4]

In his complaint, Johnson asserted that those two sets of claims were being brought under the "Fifth and/or Eighth Amendments." Actually, those claims arise, if at all, under the Eighth and Fourteenth Amendments. When Johnson was attacked by Phillip in June 2016, he was a pretrial detainee. As a result, his failure to protect and deliberate indifference claims stemming from that incident arise under the Due Process Clause of the Fourteenth Amendment. *See Goodman v. Kimbrough*, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013). The factual predicates for the remainder of his failure to protect and deliberate indifference claims occurred after Johnson was convicted, so those claims arise under the Eighth Amendment. *See Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021)

---

argument is unsuccessful. *See Sapuppo*, 739 F.3d at 681; *Holland v. Gee*, 677 F.3d 1047, 1066 (11th Cir. 2012) ("[W]e do not consider arguments not raised in a party's initial brief and made for the first time at oral argument.") (quotation marks omitted); *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1263 (11th Cir. 2004) ("A party is not allowed to raise at oral argument a new issue for review.").

[4] The defendants argue that Johnson forfeited any challenge to the district court's dismissal of his deliberate indifference claims because his objections to the magistrate judge's findings and his briefing of the issue to us are insufficient. *See, e.g., Roy v. Ivy*, 53 F.4th 1338, 1351 (11th Cir. 2022); *Singh v. U.S. Att'y Gen.*, 61 F.3d 1275, 1278 (11th Cir. 2009). We disagree. Johnson's objections to the report and recommendation and discussion in his appellate briefs adequately challenge whether his deliberate indifference claims present a new context for *Bivens* claims.

(failure to protect); *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (deliberate indifference).

Johnson's failure to protect claim is against Terry, a corrections counselor, and Warden Drew.  He alleges that he informed the two of them that he was being housed with convicted inmates in violation of BOP policy, but they did nothing to correct the situation, which led to Johnson being attacked by convicted inmates three times: in June 2016, March 2018, and April 2018.[5]  Johnson's deliberate indifference claims are based on four different incidents, and they involve five defendants and the treatment they gave or failed to give him: (1) Winston and Martin's treatment of the first injury to Johnson's hand; (2) Winston's treatment of the second injury to his hand; (3) Winston and Martin's treatment of his jaw injury and Garcia's failure to continue to provide his liquid diet; and (4) Winston, Martin, Nwude, and Harris' treatment of his left foot injury.

We will begin by explaining why Johnson's failure to protect claim and his deliberate indifference claims both arise in new contexts.  Then we will discuss why special factors counsel against recognizing either set of claims here.

### A. Johnson's failure to protect claim "presents a new *Bivens* context"

Instead of arguing that his failure to protect claim does not present a new *Bivens* context because it is not meaningfully

---

[5] Johnson himself was a convicted inmate when the last two attacks occurred.

different from *Bivens*, *Davis*, or *Carlson*, Johnson contends that the failure to protect claim is similar to the *Bivens* claim in *Farmer v. Brennan*, 511 U.S. 825 (1994), and for that reason does not present a new *Bivens* context.

That argument fails because the Supreme Court has made clear that *Farmer* is not one of its decisions creating a *Bivens* cause of action. In 2017 the Court stated in *Ziglar*, that "[t]hese three cases — *Bivens*, *Davis*, and *Carlson* — represent the *only* instances in which the Court has approved of an implied damages remedy under the Constitution itself." 582 U.S. at 131 (emphasis added). That those three cases are the only ones in which the Court had approved of a *Bivens* remedy as of 2017 means that it did not approve of one in *Farmer,* which was decided in 1994. If the Court had actually approved of a *Bivens* remedy in *Farmer,* it would have said in *Ziglar* that it had approved of a *Bivens* remedy only four times and would have included *Farmer* in its list with the other three decisions. But it didn't say or do that.

The same is true of what the Court stated and didn't state just four years ago in *Hernandez*, where it referred to *Bivens*, *Davis*, and *Carlson* as "the Court's three *Bivens* cases." 589 U.S. at 101 (quotation marks omitted). It made similar statements in *Egbert* in 2022, *Minneci* in 2012, and *Malesko* in 2001. *See Egbert*, 596 U.S. at 490–91 ("Since [*Bivens*, *Davis*, and *Carlson*], the Court has not implied additional causes of action under the Constitution."); *Minneci*, 565 U.S. at 124 ("Since *Carlson*, the Court has had to decide in several different instances whether to imply a *Bivens* action. And in each

instance it has decided against the existence of such an action."); *Malesko*, 534 U.S. at 68 ("Since *Carlson* we have consistently refused to extend *Bivens* liability to any new context or new category of defendants."). The Court's conspicuous omission of *Farmer* from the list of *Bivens* decisions it recognized in its *Ziglar*, *Hernandez*, *Egbert*, *Minneci*, and *Malesko* opinions rules out *Farmer* as a *Bivens* decision. We agree with the Seventh Circuit's reasoning in *Sargeant v. Barfield* that "[n]ot once has the Supreme Court mentioned *Farmer* alongside [its three listed *Bivens*] cases, and we think it would have if *Farmer* created a new context or clarified the scope of an existing one." 87 F.4th 358, 365 (7th Cir. 2023).

Johnson argues that the Supreme Court's failure to include *Farmer* in any of its listings of *Bivens* decisions is not determinative because the Court has told us not to "conclude [its] more recent cases have, by implication, overruled an earlier precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). The Court has declared generally that when a later case suggests that an earlier *holding* is no longer applicable, we "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Id.* (quotation marks omitted). Johnson's argument is basically that even though the Court has never listed *Farmer* as one of its *Bivens* remedy cases, it has never explicitly overruled *Farmer* either, so *Farmer* established a new context of *Bivens* remedies to which we can compare Johnson's claim.

That argument might be successful but for the insurmountable fact that the Court did not hold in *Farmer* that the *Bivens* claim

was a cognizable cause of action. It never engaged with or decided the *Bivens* issue. At most, it assumed that *Bivens* could apply but, as we will explain below, assumptions are not holdings and do not establish precedents. *See infra* at 27–28.

In *Farmer*, a transgender woman who "project[ed] feminine characteristics" was placed in the general population of the federal men's prison where she was housed. 511 U.S. at 829–30. Within two weeks she was beaten and raped by another inmate in her cell. *Id.* at 830. She sued multiple federal prison officials under *Bivens* alleging that by placing her in the general population where she "would be particularly vulnerable to sexual attack" due to her appearance, they acted with deliberate indifference to her safety. *Id.* at 829–31. The sole issue before the Supreme Court was how to define what constitutes deliberate indifference in the Eighth Amendment context. *Id.* at 829, 832. The Court's entire discussion in *Farmer* revolved around resolving that one issue. *See id.* at 835–47. The Court did not address whether a *Bivens* cause of action existed for the prisoner's claim. *See id.* at 832–51. It was not an issue before the Court. *See id.*

It is no wonder that the Court did not decide the *Bivens* issue in *Farmer*. It was not mentioned by either party at oral argument. *See* Transcript of Oral Argument, *Farmer*, 511 U.S. 825 (No. 92-7247), 1994 WL 662567. It was not mentioned in either party's briefs. *See* Brief for Petitioner, *Farmer*, 511 U.S. 825 (No. 92-7247), 1993 WL 625980; Brief for Respondents, *Farmer*, 511 U.S. 825 (No. 92-7247), 1993 WL 657282; Reply Brief for Petitioner, *Farmer*, 511

U.S. 825 (No. 92-7247), 1994 WL 190959.  It was not mentioned in the petition for certiorari.  Petition for Writ of Certiorari., *Farmer*, 511 U.S. 825 (No. 92-7247).  And it was not mentioned in the opinion of the Seventh Circuit, whose judgment was being reviewed. *See Farmer v. Brennan*, 11 F.3d 668 (Mem.) (7th Cir. 1992).  So the issue of whether a *Bivens* cause of action existed was about as absent from the *Farmer* case as it could have been.

The Supreme Court has long and consistently told us that issues not raised by the parties and not discussed in opinions are not holdings.  *Cooper Indus., Inc., v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedent.") (quotation marks omitted);  *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (holding that the Court is not bound by assumptions in previous cases); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990) ("The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions . . . are not binding in future cases that directly raise the questions.") (citations omitted); *Edelman v. Jordan*, 415 U.S. 651, 670 (1974) (concluding that the Court was not bound by a previous decision because that decision "did not in its opinion refer to or substantively treat the [relevant] argument"); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("The [issue] was not there raised in briefs or argument nor discussed in the opinion of the Court.  Therefore, the case is not a binding precedent on this point."); *Webster v. Fall*, 266 U.S. 507, 511

(1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *The Edward*, 14 U.S. (1 Wheat.) 261, 276 (1816) ("[T]he [issue] alluded to passed *sub silentio*, without bringing the point distinctly to our view, and is, therefore, no precedent."). To sum up all of those Supreme Court decisions about what are not holdings: "The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions . . . are not binding in future cases that directly raise the questions." *Verdugo-Urquidez*, 494 U.S. at 272 (citations omitted).

We have held the same thing. *See, e.g.*, *United States v. Penn*, 63 F.4th 1305, 1310 (11th Cir. 2023) ("[A]ssumptions are not holdings. And any 'answers' to questions neither presented nor decided are not precedent.") (citations and quotation marks omitted); *see also United States v. Hurtado*, 89 F.4th 881, 902 n.1 (11th Cir. 2023) ("[A]ssumptions are not holdings.") (Carnes, J., concurring) (quotation marks omitted).

*Farmer* is not the only occasion on which the Supreme Court has assumed for purposes of argument, either explicitly, or implicitly as in *Farmer*, that a *Bivens* cause of action was cognizable. *See Wilson v. Layne*, 526 U.S. 603, 609, 618 (1999) (implicitly assuming that a *Bivens* remedy was available for the plaintiff's Fourth Amendment claim but holding that the officers were entitled to qualified immunity); *Wood v. Moss*, 572 U.S. 744, 757, 764 (2014) ("assum[ing]

without deciding that *Bivens* extends to [the plaintiffs'] First Amendment claim[]," but ordering dismissal of the claim on qualified immunity grounds); *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) (same, except reversing the denial of summary judgment for the defendants on qualified immunity grounds); *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 687 (2009) (explicitly assuming without deciding that a First Amendment claim was actionable under *Bivens*, but holding that the plaintiff did not plausibly allege a constitutional violation); *Christopher v. Harbury*, 536 U.S. 403, 405, 412 n.6 (2002) (holding that the complaint failed to state an actionable claim, and noting: "The petitioners did not challenge below the existence of a cause of action under *Bivens* . . . , and we express no opinion on the matter in deciding this case."). If Johnson were correct most, if not all, of those cases should be listed with *Bivens*, *Davis*, and *Carlson* as "*Bivens* cases." But they are not and never have been. Not by the Supreme Court and not by our Court.

Most of our sister circuits that have addressed whether *Farmer* created or recognized an implied *Bivens* remedy in that context have determined that it did not. *See Tate v. Harmon*, 54 F.4th 839, 847 (4th Cir. 2022) ("[W]hile the Court allowed the action [in *Farmer*] to proceed, it never addressed whether the claim was properly a *Bivens* claim."); *Sargeant*, 87 F.4th at 365 (holding that *Farmer* did not create a *Bivens* remedy because "[t]he Court never held — just assumed — that a *Bivens* remedy was available to the plaintiff"); *Marquez v. Rodriguez*, 81 F.4th 1027, 1030–31 (9th Cir. 2023) ("The Supreme Court's *Bivens* jurisprudence squarely forecloses [the plaintiff]'s argument that *Farmer* established a

cognizable *Bivens* context."); *but see Bistrian v. Levi*, 912 F.3d 79, 91 (3d Cir. 2018) (relying on *Farmer* to find failure to protect claim did not present a new context). We agree with the Fourth, Seventh, and Ninth Circuits' holdings that *Farmer* did not create a *Bivens* remedy and thus cannot serve as a comparator case in the new context inquiry; we disagree with the Third Circuit's holding that it did and can.[6]

As we have mentioned, Johnson does not contend that his failure to protect claim is similar to the claims in *Bivens*, *Davis*, or *Carlson*. Having put all of his argument eggs in *Farmer's* basket, Johnson loses the first stage-issue of whether his failure to protect claim presents a new *Bivens* context. It does.

Instead of turning now to the second-stage issue involving Johnson's failure to protect claim, we will defer discussion of that issue until we decide the first-stage issue involving the deliberate indifference claims. Doing so will enable us to address the second-stage issue involving both categories of claims together.

---

[6] Johnson also argues that our opinion in *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090 (11th Cir. 2014), recognized a *Bivens* failure to protect claim against prison officials. But, as we have already discussed, the only decisions that count in step one of the *Bivens* analysis are the three that the Supreme Court has explicitly listed as counting. *See supra* at 24–25.

B. Johnson's deliberate indifference to serious medical
needs claims present a new *Bivens* context

Johnson contends that his deliberate indifference claims are sufficiently analogous to *Carlson* that they do not present a new *Bivens* context. We disagree.

In *Carlson* a prisoner's estate sued a group of federal prison officials for violating the prisoner's due process, equal protection, and Eighth Amendment rights. 446 U.S. at 16. The complaint alleged that the officials knew that the prisoner had chronic asthma, that the facility he was housed in had grossly inadequate medical facilities and staff, and also that the officials:

> kept [the prisoner] in that facility against the advice of doctors, failed to give him competent medical attention for some eight hours after he had an asthma attack, administered contra-indicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long a time his transfer to an outside hospital.

*Id.* at 16 n.1. The complaint contended that these failures caused the prisoner's death. *Id.* Applying the relevant standard at the time, the Court concluded that the estate's *Bivens* claims were cognizable because there were no special factors counseling hesitation by the Court nor any substitute remedy for the estate's harm. *Id.* at 18–23.

In deciding whether Johnson's deliberate indifference claims present a new context as compared to the Eighth Amendment

claim in *Carlson*, we look to *Ziglar*, 582 U.S. 120, for guidance. In *Ziglar*, the Court analyzed whether six prisoners' claim that a warden violated the Fifth Amendment by allowing prison guards to abuse the men during their detention presented a context different from *Carlson*. 582 U.S. at 146–47. The complaint alleged that the instances of abuse constituted excessive force and were "serious violations of Bureau of Prisons policy." *Id*. at 147.

After acknowledging that the claim in *Ziglar* "ha[d] significant parallels to . . . *Carlson*," the Court held that recognizing the prisoners' Fifth Amendment claim would still constitute an extension of *Bivens*. *Id*. It determined that the claim in *Ziglar* differed from the Eighth Amendment claim in *Carlson* in at least three meaningful ways: (1) "*Carlson* was predicated on the Eighth Amendment and [the claim in *Ziglar*] is predicated on the Fifth"; (2) the "judicial guidance" surrounding the standard for the claim in *Ziglar* (that the warden allowed guards to abuse detainees) was less developed than the precedent for the claim in *Carlson* (that the officials failed to provide medical treatment to a prisoner); and (3) *Ziglar* had "certain features that were not considered in the Court's previous *Bivens* cases," such as "the existence of alternative remedies" and "legislative action suggesting that Congress does not want a damages remedy." *Id*. at 147–49. In its conclusion, the *Ziglar* Court again recognized that *Carlson* and *Ziglar* were similar but ultimately held that "[g]iven this Court's expressed caution about extending the *Bivens* remedy, . . . the new-context inquiry is easily satisfied." *Id*. at 149.

As the Supreme Court did with the claim in *Ziglar*, we acknowledge that Johnson's deliberate indifference to serious medical needs claims have "significant parallels" to *Carlson*'s Eighth Amendment claim. But also as the Supreme Court did with the claim in *Ziglar*, we conclude that Johnson's claims present a new context. First, Johnson's claim based on the medical care he received after being attacked by Phillip is predicated on a different constitutional right than the one in *Carlson* (Fourteenth Amendment instead of Eighth Amendment). That alone is enough for the claim to present a new context. *See id.* at 148 ("[A] case can present a new context for *Bivens* purposes if it implicates a different constitutional right . . . ."). And that is so even though the same analysis applies to deliberate indifference claims under both amendments. *See Goodman*, 718 F.3d at 1331 n.1 (explaining that "the standards [for analyzing deliberate indifference claims] under the Fourteenth Amendment are identical to those under the Eighth") (quotation marks omitted).

While Johnson's other deliberate indifference claims arise under the Eighth Amendment as the claim did in *Carlson*, that is not enough to prevent the context of those claims from being a new one for *Bivens* purposes. *See Hernandez*, 589 U.S. at 103 ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized.").

As the Court found in *Ziglar*, we find that the context of these claims is different from the context of the claim in *Carlson*

because there the Court did not consider whether there were alternative remedies under the current alternative remedy analysis. *See Ziglar*, 582 U.S. at 148 ("This case also has certain features that were not considered in [*Carlson*] and that might discourage a court from authorizing a *Bivens* remedy" such as "the existence of alternative remedies"); *Egbert*, 596 U.S. at 492 ("[W]e have explained that a new context arises when there are 'potential special factors that previous *Bivens* cases did not consider.'") (quoting *Ziglar*, 582 U.S. at 140). In *Carlson*, the Court asked whether there were "alternative remed[ies] which [Congress] explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective," and it found that the Federal Tort Claims Act did not meet that standard. *Carlson*, 446 U.S. at 18–19.

Now as part of the special factors analysis that we consider, *see infra* at 36–42, we ask whether *any* alternative remedy exists that Congress or the Executive believed to be sufficient to remedy the type of harm Johnson allegedly suffered. *Egbert*, 596 U.S. at 498 (explaining that the existence of any "remedial process" that Congress or the Executive "finds sufficient" prohibits the creation of a *Bivens* remedy). The fact that *Carlson* did not consider the existence of alternative remedies under the framework explained in *Egbert* renders Johnson's claim different from the one in *Carlson*. *See Ziglar*, 582 U.S. at 148; *see also Egbert*, 596 U.S. at 500–01 (distinguishing *Davis* from the claim in *Egbert* because *Davis* "predates our current approach to implied causes of action and diverges from the prevailing framework," and explaining that "a plaintiff cannot justify a *Bivens* extension based on 'parallel circumstances' with *Bivens*,

[*Davis*], or *Carlson* unless he also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law") (quoting *Ziglar*, 582 U.S. at 139).

As we will discuss in more detail later, alternative remedies existed for prisoners in Johnson's position besides bringing a *Bivens* action, namely submission of a grievance form though the BOP administrative remedy program. *See infra* at 37–42; *Malesko*, 534 U.S. at 74 (explaining that the BOP administrative remedy program is a "means through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring"). Because an alternative remedy existed to remedy the type of harm Johnson allegedly suffered, and because the *Carlson* Court did not consider the existence of such remedies under the Supreme Court's current analytical framework, Johnson's case is different from *Carlson*.

Also relevant is the fact that the injury in this case is different from the one in *Carlson*. There the prisoner died from an asthma attack when officials failed to provide the medical care required to treat it. Here Johnson suffered severe but ultimately non-lethal physical injuries to his body that were eventually treated by the defendants. The severity, type, and treatment of Johnson's injuries differ significantly from those of the prisoner in *Carlson*.

Johnson lists some similarities between his deliberate indifference claim and the one in *Carlson* that he believes should be enough to satisfy the new context inquiry. He contends that both claims involve prison officials, medical officers in the prison, and

the deprivation of "medically necessary assistance," including the treatment prescribed by a doctor.  To that extent, the claims in the two cases are similar on their face.  But the first-stage new context inquiry requires more than "superficial similarities."  *Egbert*, 596 U.S. at 495; *see Ziglar*, 582 U.S. at 147–49 (holding that a claim that presented "significant parallels" to *Carlson* still presented a new context).

        We look at whether the two cases have *any* relevant differences, not whether they are mostly the same.  As the Court decided in *Ziglar*, "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." 582 U.S. at 139.  And even small differences can "easily satisf[y]" the new context inquiry so long as they are meaningful.  *See id.* at 149. This case is different from *Carlson* in several meaningful ways.  As we have noted, one of Johnson's claims involved a different constitutional claim than in *Carlson*.  And the Court in *Carlson* did not apply the current alternative remedies analysis to the claim there. The severity, type, and treatment of Johnson's injuries were different from those of the plaintiff in *Carlson*.  Those differences make this a new context under the first-stage inquiry.

### C. Special factors argue against extending *Bivens* to this new context

        Because Johnson's failure to protect and his deliberate indifference to serious medical needs claims arise in a new context, the next step — stage two — is determining whether there are any special factors that would cause us to hesitate before extending *Bivens*

to those new contexts. "If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy. *Egbert*, 596 U.S. at 492 (quotation marks omitted).

One notable special factor is the existence of an alternative remedial structure to remedy the harm the plaintiff has allegedly faced. "[I]f Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure" to address a plaintiff's allegations, there is no need for an additional *Bivens* remedy. *Id*. at 493 (quotation marks omitted). In other words, if there is "*any* alternative, existing process for protecting the injured party's interest," *Ziglar*, 582 U.S. at 137 (cleaned up) (emphasis added), the purpose of creating *Bivens* actions has already been realized by another means, *Egbert*, 596 U.S. at 498. Courts are not to "second-guess that calibration by superimposing a *Bivens* remedy." *Id*.

Congress, through the Executive Branch, has authorized an alternative remedy that applies here: the BOP's administrative remedy program. The Supreme Court has pointed that out. *See Malesko*, 534 U.S. at 74 (finding that the BOP's administrative remedy program was an appropriate alternative remedy to a *Bivens* claim). It's not our place to "second-guess that calibration." *Egbert*, 596 U.S. at 498.

Johnson contends that the BOP's administrative remedy program should not be considered a sufficient alternative remedy for him, and hence not a special factor, because the district court found that he was denied access to the program. But whether the

plaintiff himself was denied access to an alternative remedy is not the question. The question is "whether the Government has put in place safeguards to prevent constitutional violations from recurring." *Egbert*, 596 U.S. at 498 (alteration accepted) (quotation marks omitted); *see id.* at 493 ("Importantly, the relevant question is not . . . whether the court should provide for a wrong that would otherwise go unredressed . . . .") (quotation marks omitted); *see also id.* at 497 (declining to create a *Bivens* remedy because "Congress has provided alternative remedies *for aggrieved parties in* [*the plaintiff*]'s *position*") (emphasis added). The alternative remedy question is a general one, not a specific one; a macro focus, not a micro focus.

That means it does not matter whether we think the administrative remedy program adequately addressed Johnson's complaints. It doesn't matter because the Supreme Court has held that: "the question whether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts." *Id.* at 498; *see also id.* at 493 (explaining that it "does [not] matter that existing remedies do not provide complete relief") (quotation marks omitted). The only consideration is whether there is a remedial process in place that is intended to redress the kind of harm faced by those like the plaintiff. And there is one here. The BOP's administrative remedy program.

*Egbert* makes clear that an alternative remedy need not satisfactorily address every plaintiff's complaints to be sufficient. In that case the plaintiff argued that the Border Patrol's grievance process was not an adequate alternative remedy because, while he was able

to file a claim that was investigated by Border Patrol, he was not able to participate in the proceedings after his complaint was filed, nor was there a right to judicial review of an adverse decision. *Id.* at 489–90, 497. The Supreme Court rejected that argument, explaining that it had "never held that a *Bivens* alternative must afford rights to participation or appeal." *Id.* at 497–98. Because "*Bivens* is concerned solely with deterring the unconstitutional acts of individual officers," the purpose of the alternative remedy special factor analysis is to avoid encroaching on a process or remedy that Congress or the Executive has put in place. *Id.* at 498 (quotation marks omitted). "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Id.*

Because the Court has told us that the ultimate question is whether Congress or the Executive created an alternative remedy, we can't look at the adequacy or efficacy of the alternative remedy in general or in relation to a specific plaintiff. The inquiry can be criticized as toe-deep, superficial, and cursory, but if Congress or the Executive has acted, we are to presume that they deemed their action sufficient to achieve its purpose, and that bars creation of a *Bivens* cause of action.

Here, Congress through the Executive Branch put the BOP administrative remedy program in place to address prisoner grievances, including those involving alleged constitutional violations. *See* 28 C.F.R. § 542.10(a) ("The purpose of the Administrative

Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement."); *see also Malesko*, 534 U.S. at 74. In doing so, Congress through the Executive Branch found that remedial process to be appropriate and adequate. We cannot second-guess that judgment and superimpose a *Bivens* remedy on top of the administrative remedy, which would allow prisoners to bypass the grievance process. *See Egbert*, 596 U.S. at 497–98. Although Johnson believes he was, in essence, not allowed to access the grievance procedure, that is not enough to disqualify it as a special factor and authorize the creation of a new *Bivens* remedy.[7]

---

[7] Johnson also asserts that because the Court in *Egbert* and *Hernandez* pointed out that the plaintiffs in those cases were actually able to take advantage of the relevant grievance procedure, those decisions establish that an alternative remedial process cannot be a relevant special factor unless it is actually available to the plaintiff himself. *See Hernandez*, 589 U.S. at 104–06 (explaining that because the Executive Branch has already determined that there was no misconduct and because the case implicated foreign relations, there was no need for the judicial branch to create a cause of action); *Egbert*, 596 U.S. at 497 ("As noted, [the plaintiff] took advantage of this grievance procedure, prompting a year-long internal investigation into [the defendant's] conduct."); *see also id.* ("In *Hernandez*, we declined to authorize a *Bivens* remedy, in part, because the Executive Branch already had investigated alleged misconduct by the defendant Border Patrol agent."). Although the alternative remedies in *Hernandez* and *Egbert* were actually available to the plaintiffs in those cases, the Supreme Court in *Egbert* made clear that is not a requirement. *See supra* at 38–39; *Egbert*, 596 U.S. at 493, 497–98.

True, those clear statements in *Egbert* are dicta. But, as we stated in *Schwab* about some other dicta: "[T]here is dicta and then there is dicta, and then there is Supreme Court dicta. This is not subordinate clause, negative pregnant,

The Supreme Court has instructed us that the existence of a grievance procedure is a special factor that by itself is enough to rule out inferring a *Bivens* cause of action. This is what the Court said about that in *Egbert*, its latest decision on the subject:

> Finally, our cases hold that a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure. If there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action. Importantly, the relevant question is not whether a *Bivens* action would disrupt a remedial scheme, or whether the court should provide for a wrong that would otherwise go unredressed. Nor does it matter that existing remedies do not provide complete relief. Rather, the court must ask only whether it, rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy. [T]he question is who should decide.

---

devoid-of-analysis, throw-away kind of dicta. It is well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court . . . ." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006); *see also Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997) ("[D]icta from the Supreme Court is not something to be lightly cast aside."); *United States v. City of Hialeah*, 140 F.3d 968, 974 (11th Cir. 1998) ("Even though that statement by the Supreme Court . . . was dictum, it is of considerable persuasive value, especially because it interprets the Court's own precedent.").

596 U.S. at 493 (cleaned up); *see also id.* at 492 ("If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy.") (quotation marks omitted).

As we have noted, Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure in the form of a grievance procedure for use by federal prison inmates. And it is in place. That by itself is "a single reason to pause before applying *Bivens*" in the new context of this case, and the Supreme Court has instructed us that means we may not recognize a *Bivens* remedy in a case like this one. *Egbert*, 596 U.S. at 492 (quotation marks omitted). We cannot extend *Bivens* here because doing so would "arrogate legislative power" and allow federal prisoners to bypass the grievance process put in place by Congress through the Executive Branch. *See Egbert*, 596 U.S. at 492 (alteration accepted) (quotation marks omitted).

## IV. Conclusion

We follow the Supreme Court's instructions and will not venture beyond the boundaries it has staked out. We will not infer any new *Bivens* causes of action in this case.

**AFFIRMED.**